# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

APRIL GILMORE-LEE,        )
       )
      Plaintiff,        )
       )
      v.        )        No. 4:20-cv-00408-DGK
       )
TOM VILSACK,[1]        )
SECRETARY, UNITED STATES        )
DEPARTMENT OF AGRICULTURE, et al.,        )
       )
      Defendants.        )

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This employment case arises from the United States Department of Agriculture's ("USDA") failure to promote Plaintiff April Gilmore-Lee to the role of Chief of the Policy Administration Branch for Product Management ("Branch Chief") in the Kansas City office. As a result, Plaintiff filed a five-count lawsuit against Defendants Tom Vilsack, Secretary of the USDA, and the United States of America, alleging claims for: (1) sex and race discrimination; (2) disability discrimination; (3) a racially hostile work environment; (4) a sexually hostile work environment; and (5) retaliation. Defendants deny these allegations.

Now before the Court is Defendants' motion for summary judgment on all counts. SJ Mot., ECF No. 19. Plaintiff opposes the motion. Suggs. in Opp'n, ECF No. 24. For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Defendants are entitled to summary judgment on every claim except for Plaintiff's race and disability discrimination failure-to-promote claims.

---

[1] Plaintiff initially filed this case against the then-Secretary Sonny Perdue. Tom Vilsack is now Secretary, so the Court lists him as the interested party.

**Undisputed Material Facts**

Plaintiff, who identifies herself as a tall, dark-skinned African-American female, has been an USDA employee since 2006.  In late 2016, Plaintiff sought a promotion to Branch Chief.  After the application process and multiple rounds of interviews, Plaintiff did not get the position.  It instead went to Chandra Mason, a Caucasian female.  This decision and the actions following it sparked this lawsuit.  The following sections set forth the undisputed material facts.

**A.  The hiring decision.**

In late 2016, Plaintiff worked as a Risk Management Specialist in the USDA's Kansas City, Missouri office.  At that time, the Branch Chief position became available.  Plaintiff applied, and so did Ms. Mason.  When Ms. Mason applied, she had worked in the USDA Risk Management Agency for two years as an Agricultural Economist.

Plaintiff, Ms. Mason, and several other candidates all went through the same hiring process.  First, the Human Resources Department ("HR") reviewed application packets, and HR then referred the best candidates to Mr. Timothy Hoffman.  Mr. Hoffman, a Caucasian male, was Plaintiff's second-line supervisor and was responsible for making the final hiring decision.

HR referred Plaintiff along with nine other candidates—including Ms. Mason—to Mr. Hoffman for the next round of the selection process.  The second round involved the candidates being interviewed by a three-member panel comprised of two males and one female, with two of them being Caucasian and one being African American.  The interviewers asked each candidate ten questions and ranked their answers on a scale from 1 through 5, with a higher scoring being better.  Plaintiff scored the highest on the interview with a score of 139 out of 150, while Ms. Mason tied for second with a score of 122 out of 150.  Following the panel interview, Mr. Hoffman

2

met with the panel members to discuss the interviews. Plaintiff, Ms. Mason, and two other candidates were then selected to move onto the next phase of the hiring process.

The next phase involved an interview with Mr. Hoffman and his supervisor Mr. Rodger Matthews, an African-American male. Following the interviews, Mr. Hoffman and Mr. Matthews stated that Ms. Mason performed far better than Plaintiff. Mr. Matthews, in particular, described Plaintiff's interview as "less than spectacular."

But that did not end this portion of the hiring process. Mr. Hoffman also spoke with Plaintiff and Ms. Mason's supervisors and colleagues for feedback. With respect to Plaintiff, Mr. Hoffman spoke with Ms. Pam Bollinger, Plaintiff's then-direct supervisor. Mr. Hoffman attests that Ms. Bollinger told him that Plaintiff "just likes to debate issues too long." In her summary judgment response, Plaintiff attached an affidavit from Ms. Bollinger. Ms. Bollinger denies making the statement and attests that she gave Plaintiff a positive review. Ms. Bollinger also attested[2] that Mr. Hoffman believed that Plaintiff was lazy and that he told her Plaintiff did not have the personality for the job. Without providing specific names, Mr. Hoffman also attested that certain employees in the department told him they were concerned about Plaintiff's timeliness and responsiveness if she were selected.[3] Plaintiff, on the other hand, submitted affidavits from several of her former supervisors and colleagues that attested that she was more qualified for the job than Ms. Mason, had significant high-profile experience, was a hard worker, was smart, was a team player, consistently helped other employees, and did not have timeliness problems.

---

[2] The Court uses "attested" throughout the order because the parties have not submitted any deposition testimony. Instead, they have only submitted affidavits and declarations.

[3] Plaintiff objects to all of the feedback that Mr. Hoffman recounted as inadmissible hearsay. That is not so. Defendants do not seek to introduce the feedback for the truth of the matter; they only seek to introduce it to show the impact it had on Mr. Hoffman, the listener, and to explain his subsequent hiring decision.

3

Mr. Hoffman described the feedback from Ms. Mason's supervisors as more positive. Mr. Hoffman attests that Ms. Mason's first-line supervisor described her as his best employee and said she was very impressive. Mr. Hoffman also attested that Ms. Mason's division director described her as a great employee, felt she would be a good supervisor, and expressed remorse in losing her as an employee from his division.

After the hiring decision, Mr. Hoffman attested that he had considered the candidates' respective educational backgrounds and work experience. As for Plaintiff, she has a bachelor's, a master's, and a juris doctorate degree. Plaintiff has worked in numerous capacities and a variety of projects at the USDA in the over ten years she has worked there. She served as an expert witness for the USDA on a variety of topics. Plaintiff has completed her USDA-required leadership and supervisory training, and she has given numerous presentations to large audiences across the country. Plaintiff has authored a variety of national-level bulletins, white papers, final agency determinations, public policy briefings, and other various written documents.

Ms. Mason has a bachelor's degree, and some hours towards a master's degree. She had worked at the USDA as an Agricultural Economist for two years prior to the promotion. Prior to that position, Plaintiff worked as a grain merchandiser for a private company. In that role, she was responsible for purchasing, selling, and coordinating various grains and animal feed. At the time of her promotion, Ms. Mason had undergone some leadership training and was enrolled in the USDA-required leadership program, but she had not yet completed it. Ms. Mason made presentations to large groups and facilitated large meetings in her prior roles.

Mr. Hoffman concluded the selection process by hiring Ms. Mason. Mr. Hoffman later recounted the basis for this decision. He said that although both Ms. Mason and Plaintiff had "highly relevant educational backgrounds and work experience," he "did not find [Plaintiff's]

4

second interview as impressive" and he was not provided with "as positive feedback [for Plaintiff] as [he] was for [Ms. Mason]. SJ Mot., Ex. D, ECF No. 19-4 at 3. Mr. Hoffman also stated that Ms. Mason's "past work experience, education, resume, first and second interview results and feedback" led to her hiring. *Id.* At some point, Plaintiff talked to Mr. Hoffman about why she did not get the job. According to Plaintiff, Mr. Hoffman said that "she had a lot going on" and she was "not in the best position for the promotion." Pls' SOF, Ex. 8, ECF No. 23-8 at 5, 7.

**B. Plaintiff's experience at the USDA following the hiring decision.**

In January 2017, after Plaintiff was denied the Branch Chief promotion, she contacted the EEO. Although Plaintiff does not provide precise times, she endured various employment actions at some point after the hiring decision but apparently before she obtained a different promotion. These actions included having projects "shelved," being taken off systems and meetings, not being provided "backup" for subject matter she worked on, and having her desk moved to a non-private area. Plaintiff does not indicate precisely who took these actions. But she does indicate that Mr. Hoffman had others criticize her work and took assignments from her.

In February 2017, Plaintiff was promoted to Lead Legal Administrative Specialist in the Office of Compliance. This position, like the Branch Chief position she did not get, was classified as a GS[4]-14 position. The new position was based out of Washington, D.C., but she continued to work in the Kansas City office. While Plaintiff's supervisors were in Washington, D.C., Mr. Matthews contended he was in charge of the physical office in Kansas City. In the new role, her new supervisors allowed her to telework more often. But Mr. Matthews called her supervisors several times about her teleworking, and he also alleged she was abusing the telework process.

---

[4] "GS" means General Schedule, which is a classification and pay system used by the federal government. *See* General Schedule Overview, U.S. Office of Personnel Management Website, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited November 3, 2022).

Her supervisors then allowed her to transition from a partial telework position to a fully remote position. When she sought a shredder from the Kansas City office to help with her remote work, Mr. Matthews confronted her about not being at her desk.

After she was approved for full remote work, an HR issue required Plaintiff to return to the Kansas City office to work while they resolved the issue. At this time, someone from the office sent pictures of Plaintiff's empty desk while she was on vacation, and someone put a sign on her desk that said, "at home teleworking." Plaintiff also was not given an office even though one was available and people in her position typically had one. And when Plaintiff was on approved travel, Mr. Matthews reported Plaintiff's comings and goings to her supervisor. Plaintiff's co-worker, Francisco Del Pozo, attested that Ms. Mason would observe and watch Plaintiff all the time. Mr. Del Pozo attested that Plaintiff was singled out; Caucasian employees were not treated the same.

### C. USDA work environment generally.

Plaintiff has presented various affidavits from co-workers about the working conditions. Many of the attestations make statements without identifying a time, so it is unclear when many of the events occurred or if Plaintiff was even working when they occurred.

Mandy Welton, like Plaintiff, was a Risk Management Specialist in the Kansas City office. She attested that the office was "very male dominated" under the leadership of Mr. Hoffman, Mr. Matthews, and office head Tim Witt. She also described it as "oppressive" for women. At times during her tenure, she has observed more highly qualified African-American women passed over for positions that were given to Caucasian men.

Ms. Bollinger also attested to the working conditions. She described it as a "good old boys" network, and that women were not supposed to be in leadership roles. Ms. Bollinger attested that women were relegated to "low fruit" roles and discouraged from speaking at meetings. But

6

Ms. Bollinger was promoted to Branch Chief, though she described herself as a "cute, blonde" female when she was promoted. When Ms. Bollinger became Branch Chief, she was ignored by upper management and had to pass her suggestions through her immediate supervisor to be relayed to Mr. Witt. On one occasion, Mr. Matthews pointed his finger in her face and screamed at her. Without giving any details or timing, Ms. Bollinger attests that she "observed [Plaintiff] suffering the same kind of abuse and discrimination." Ms. Bollinger further attested that Mr. Matthews viewed black women as challenging and bold. On the issue of teleworking, Ms. Bollinger attested that her employees were singled out for teleworking, and Plaintiff was one of those employees.

Plaintiff also attested to the working conditions. She attested that there have been only a few African-American employees in leadership positions. She also attested there was only one African-American female Branch Chief, but she only remained in that role for a year. Plaintiff attested that in the Product Administration Department, all the Branch Chiefs were Caucasian males, except for Ms. Bollinger. She further attested that there are "no larger black tall females" in those positions.

Following the retirement of Mr. Hoffman, Mr. Matthews, and Mr. Witt, several employees have attested that the environment changed. More women are in management positions, the environment became more relaxed, and several women have been promoted.

**D. Plaintiff's attention deficit hyperactivity disorder.**

In 2016, before she applied to become Branch Chief, Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD")[5]. This is permanent medical condition, that when left untreated, can make Plaintiff unable to concentrate and complete her work tasks, increase

---

[5] Plaintiff states in her statement of facts that she was diagnosed with "Attention Deficit Disorder," Pls' SOF, ECF No. 234 at 35, but Plaintiff and Defendants repeatedly describe her condition as "ADHD." The Court, thus, uses ADHD in this order. But even were it ADD, it would not change the Court's analysis.

her anxiety, and create inattentiveness.  When the ADHD is properly treated, she has no trouble fulfilling the functions of her job.

The management officials responsible for the promotion decision learned of her ADHD in December 2016.  During that time, Plaintiff missed a substantial amount of work, so Ms. Bollinger informed Mr. Hoffman of the situation.  Plaintiff also had a conversation directly with Mr. Hoffman about her condition.  Her medical condition also came up during her second interview for the Branch Chief role.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving parties, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the burden of showing this lack of genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986).

To survive a motion for summary judgment, the nonmoving party must nonetheless substantiate her allegations "with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy."  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotations omitted).  There is "no 'discrimination case

8

exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). No matter the type of case, "[w]here the record taken as a whole could not lead a trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 1042.

## Discussion

Although the complaint contains five counts, Plaintiff has included two separate claims in the first count. Defendants move for summary judgment on each claim. For the purposes of analytical clarity, the Court addresses the race, sex, and disability claims (Counts I and II) in the first section, the hostile work environment claims (Counts III and IV) in the second section, and the retaliation claim (Count V) in the final section.

**I.    Defendants have not demonstrated they are entitled to summary judgment on Plaintiff's race and disability discrimination claims, but they have shown they are entitled to summary judgment on Plaintiff's sex discrimination claim.**

Plaintiff has brought race and gender discrimination claims under Title VII as well as a disability discrimination claim under the Rehabilitation Act. Each claim is subject to the same analytical framework. Plaintiff has not presented any direct evidence of discrimination, so the familiar *McDonnell Douglas* burden-shifting framework applies to each claim. *See Watson v. McDonough*, 996 F.3d 850, 854 (8th Cir. 2021) (race discrimination); *Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1038 (8th Cir. 2010) (sex discrimination); *Kosmicki v. Burlington N. & Santa Fe R. Co.*, 545 F.3d 649, 651 (8th Cir. 2008) (disability discrimination). Under this framework, Plaintiff must first establish a prima facie case of discrimination. *Watson*, 996 F.3d at 854. If Plaintiff establishes a prima facie case, the burden shifts to Defendants to articulate "a legitimate, nondiscriminatory reason for the discharge." *Id*. If Defendants "present[] such

evidence, the burden shifts back to the employee to produce evidence that the employer's stated reasons are a pretext for discrimination." *Kosmicki*, 545 F.3d at 651.

Before applying this framework to each of these claims, the Court must first address one issue that applies to them all. To prove a prima facie case of race, sex, or disability discrimination, Plaintiff must establish that she suffered an adverse employment action. *See Watson*, 996 F.3d at 855; *Fiero*, 759 F.3d at 878; *Kosmicki*, 545 F.3d at 651. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019) (internal quotation marks omitted). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007). In certain circumstances, "lesser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position." *Charleston*, 926 F.3d at 989 (internal quotation marks omitted).

For each claim, Plaintiff presents largely the same alleged evidence of putative adverse employment actions, including: (1) she did not get the Branch Chief job; (2) work was taken from her and her work was criticized; (3) her desk was moved and she was not given an office; (3) she was kicked out of systems, taken off meetings and roles, and not allowed to have a backup; (4) Mr. Matthews made untrue allegations about her to her new manager in the USDA, monitored her work closely, allegedly interfered with her ability to work remotely, and complained to her new manager about her working remotely.

There is no question that failure to promote is an adverse employment action.  *See Watson*, 996 F.3d at 855.  But the other actions noted above are nothing more than "minor changes in duties or working conditions," albeit "unpalatable or unwelcome ones."  *See Clegg*, 496 F.3d at 926. Plaintiff has failed to show that the other actions above either singly—or cumulatively—led to a "material employment disadvantage," *id.*, or "were serious employment consequences that adversely affect[ed] or undermine[d] h[er] position," *Charleston*, 926 F.3d at 989.  Indeed, the Eighth Circuit has routinely found no adverse employment actions exist on similar or comparable facts.  *See Watson*, 996 F.3d at 855 (decision not to board the position, inadequate training, assignment of additional work, performance review, and written counseling were not adverse actions); *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013) (depletion of sick leave, coaching and counseling sessions, and longer personnel file were not adverse actions); *Clegg*, 496 F.3d at 927 (not being welcomed back to position, not immediately being provided the items needed to do her job, not having work assignments immediately reassigned, and a bad performance review were not adverse actions); *Higgins v. Gonzalez*, 481 F.3d 578, 584–588 (8th Cir. 2007) (job reassignment, lack of training and mentorship, whisper campaign of demeaning comments, false complaints about her work, a termination recommendation without a resulting termination, and transfer did not constitute adverse employment actions), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *see also AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (collecting numerous cases with comparable actions to those alleged here where the Eighth Circuit found no adverse employment action).

Plaintiff sidesteps this wealth of authority showing why the conduct here does not constitute adverse employment actions.  Instead, she relies on *Kim v. NashFinch Co.*, 123 F.3d

1046 (8th Cir. 1997), arguing that the "kind of undercutting" she suffered constitutes an adverse action. But *Kim* is distinguishable: the employer systematically retaliated against Kim "by reducing his job responsibilities, giving him significantly lower performance evaluations, requiring he undergo remedial training, and placing negative reports in his personnel file." *See Watson*, 996 F.3d at 856 (distinguishing *Kim*). The "extreme set of facts" and "systemic bad treatment" in *Kim* is not present here. *See Jackman*, 728 F.3d at 805 (distinguishing *Kim*); *Higgins*, 481 F.3d at 588 (same); *Sallis v. Univ. of Minn.*, 408 F.3d 470, 477 (8th Cir. 2005) (same).

Accordingly, the Court holds that while Plaintiff's lack of promotion constitutes an adverse employment action for purposes of her race, sex, and disability claims, the other actions do not.

### A. Plaintiff has established a submissible race discrimination claim.

Plaintiff alleges that she suffered racial discrimination because she was not selected for the Branch Chief job; instead, the job went to Chandra Mason, a Caucasian female. To prove a prima facie case of race discrimination in the hiring context, Plaintiff must prove: "(1) [she] is in a protected class, (2) [she] was qualified for the position, (3) [she] was denied that position," and (4) the employer filled the position with a person not in the same protected class." *Carter v. Atrium Hospitality*, 997 F.3d 803, 809–810 (8th Cir. 2021) (internal quotation marks omitted). Defendants concede that Plaintiff can satisfy this standard, but they argue that they have provided legitimate, non-discriminatory reasons for their decision and that Plaintiff cannot show pretext.

Even assuming that Defendants have proffered legitimate, non-discriminatory reasons for not promoting Plaintiff, the Court finds that Plaintiff has raised a genuine dispute as to whether those reasons were pretext for discrimination. To establish pretext, Plaintiff must "present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *McNary v. Schreiber*

*Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008) (quotation omitted); *see also Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) ("To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has proffered a phony excuse."). The avenues for proving pretext include demonstrating that the employer's explanation "has no basis in fact," that the employer "shifted its explanation," or that "the employer deviated from [its] policies." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1017 (8th Cir. 2017).

Here, Timothy Hoffman explained that he did not select Plaintiff because "he did not find her second interview as impressive nor was [he] provided as positive feedback about [Plaintiff] as [he] was [about Mason]." SJ Mot., Ex. D, ECF No. 19-4 at 3. On the feedback front, Hoffman claimed that Plaintiff's supervisor, Pam Bollinger, told him that "she feels sometimes [that Plaintiff] likes to debate issues too long." *Id.* But with her summary judgment response, Plaintiff presented an affidavit from Ms. Bollinger where she claims that she *did not* say that, she actually gave Plaintiff a very positive review, and she said that Plaintiff was a dedicated—not lazy—worker. Pls. SOF, Ex. 3, ECF No. 23-3 at 6–7. Ms. Bollinger also attested that Mr. Matthews—who was involved in the hiring decision—made it clear that he did not like being challenged and that he viewed black women as challenging and bold. *Id.* Ms. Bollinger also attested that Mr. Hoffman viewed Plaintiff as lazy and confrontational. *Id.*

When viewed in the light most favorable to Plaintiff, there is a genuine dispute as to whether the positive feedback rationale for not hiring Plaintiff has a basis in fact or whether race was actually the motivating reason for the decision. To be sure, there is other significant evidence in the record that may allow a jury to conclude that race was not the motivating reason. But that is a conclusion that must be reached by the jury, not the Court.

**B.      Plaintiff cannot establish a sex discrimination claim.**

Aside from race, Plaintiff also alleges that her sex was in part the reason that she did not get the Branch Chief role.  Unlike the preceding claim, Defendants argue that Plaintiff *cannot* satisfy the prima facie elements for sex discrimination in hiring because the role ultimately went to another female.  SJ Mot. at 19–20.

Defendants are correct.  As noted above, in the failure-to-promote context or hiring context, the Eighth Circuit has routinely stated that one of the elements that Plaintiff must prove as part of the prima facie case is that "the employer filled the position with a person not in the same protected class." *Carter*, 997 F.3d at 809–810; *Gipson v. Dassault Falcon Jet Corp.*, 983 F.3d 377, 381 (8th Cir. 2020); *Nelson v. USAble Mut. Ins. Co.*, 918 F.3d 990, 993 (8th Cir. 2019) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc)).  Indeed, relying on Eighth Circuit precedent, Plaintiff agrees that this is a prima facie element in failure-to-promote cases. Opp'n at 6 (quoting *Austin v. Minn. Min. and Mfg. Co.*, 193 F.3d 992, 995 (8th Cir. 1999)).  And for purposes of Plaintiff's sex discrimination claim, it is undisputed that Ms. Mason, like Plaintiff, is a female.  So Plaintiff cannot meet the fourth element for a prima facie case.

That does not end the inquiry, however.  The Eighth Circuit has noted in other instances that "there might be some cases in which a plaintiff can establish a prima facie case even though the selected employee was a member of the same protected class because the fact goes to the weight of the evidence as opposed to its legal sufficiency." *Gipson*, 983 F.3d at 381 n.2.  Although Plaintiff does not cite this caselaw, she seems to be indirectly invoking it by arguing that this is an exceptional case where an inference of sex discrimination exists based on sex stereotyping. Relying on *Lewis v. Heartland Inns of America, LLC*, 591 F.3d 1033 (8th Cir. 2010) and similar

14

cases, Plaintiff argues that she did not fit the sex stereotype of what Defendants viewed a female should be, namely, she was not a blonde like Ms. Mason.  Opp'n at 2, 14.

But *Lewis* is distinguishable.  There, the employer fired a female plaintiff for a front desk position at motel where the evidence showed that the plaintiff described her own appearance as "slightly more masculine," she wore "loose fitting clothing, including men's button down shirts and slacks," she avoided "makeup and wore her hair short at the time," she "had been mistaken for a male and referred to as 'tomboyish,'" the manager commented that the plaintiff "lacked the 'Midwestern girl look'" and that the staff should be "pretty," and the managerial staff purchased video equipment to view applicants before hiring them.  *Lewis*, 591 F.3d at 1036–1037.

Nothing in the record here approaches what happened in *Lewis*.  As concerns sex, Plaintiff has only presented evidence that she was tall, while Chandra Mason was blonde.[6]  Plaintiff presents no evidence regarding how she dressed or appeared, how the decisionmakers perceived her dress or appearance, or any comments from them suggesting that they explicitly considered her dress or appearance in their hiring decision.  *Cf. id.*  Nor does she present any evidence suggesting that the decisionmakers believed her demeanor or personality was not "feminine" enough or too "feminine" for the role.  *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 251 (1989) (sex stereotyping existed where the management referred to the plaintiff as "macho" and in need of "charm school" and recommended that she "walk more femininely, talk more femininely, and dress more femininely").  Unlike *Lewis*, Plaintiff has not raised an inference of discrimination based on sex stereotyping.

Since the job Plaintiff sought was given to someone of her same protected class and because she has not provided any other evidence raising an inference of discrimination, the Court

---

[6] Plaintiff never provided a statement of fact regarding Ms. Mason's appearance; she only made arguments regarding her appearance in her opposition brief.

15

finds that she has not established a prima facie case of sex discrimination. *See Gipson*, 983 F.3d at 381 n.2. (holding that plaintiff failed to prove prima facie case where the person promoted was of the same protected group and plaintiff presented no other evidence raising an inference of discrimination). Defendants, thus, are entitled to summary judgment on this claim.

### C. Plaintiff has established a submissible disability discrimination claim.

In addition to race and sex, Plaintiff also alleges that her ADHD was the reason she did not get the promotion. Defendants argue that she cannot satisfy her prima facie case because she has not shown she was disabled or perceived as disabled. They also argue that even if she can establish a prima facie case, she cannot show pretext.

For purposes of summary judgment, Defendants' arguments are unavailing. To establish a prima facie case of disability discrimination, Plaintiff must establish in part that she was "disabled within the meaning of the ADA." *Tramp v. Assoc. Underwriters, Inc.*, 768 F.3d 793, 804 (8th Cir. 2014); *see also Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013) ("Since the ADA and Rehabilitation Act are 'similar in substance,' we treat the case law interpreting them as 'interchangeable.'"). Disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such impairment, or being regarding as having such an impairment." *Tramp*, 768 F.3d at 804 (internal quotation marks omitted). A major life activity includes, among other things, "reading, concentrating, thinking, communicating, and working." *Scheffler v. Dohman*, 785 F.3d 1260, 1261 (8th Cir. 2015). Here, it is undisputed that Plaintiff was diagnosed with ADHD. It is further undisputed that when untreated, Plaintiff's ADHD can cause an inability to concentrate, increase her anxiety, create inattentiveness, and makes her unable to complete her tasks. It is also undisputed that Plaintiff missed work in 2016 because of her ADHD, and she discussed her ADHD with Mr. Hoffman

16

around that time. Thus, Plaintiff has satisfied her prima facie burden of showing that she is disabled.

And even assuming that Defendants can establish a legitimate, non-discriminatory reason for their decision not to promote her, Plaintiff has established pretext. As explained above, there is genuine dispute as to whether Mr. Hoffman's claimed reason of not hiring Plaintiff due to poor feedback is indeed true. Not only that, but it is undisputed that Plaintiff's ADHD was discussed during her interview. Moreover, Plaintiff attests that Mr. Hoffman informed her after the interview that one of the reasons she was not selected was because she "had a lot going on." Pls' SOF, Ex. 8, ECF No. 23-8 at 5, 7.

When viewed in the light most favorable to Plaintiff, there is a genuine dispute as to whether the positive feedback rationale for not hiring Plaintiff has a basis in fact or whether her ADHD was actually the motivating reason for the decision. To be sure, there is other significant evidence in the record that may allow a jury to conclude that race was not the motivating reason. But that is a conclusion that must be reached by the jury, not the Court.

## II.   Plaintiff cannot establish a hostile work environment claim.

Plaintiff also alleges that Defendants created both a racially and sexually hostile work environment. Defendants argue that Plaintiff cannot satisfy the prima facie elements for either claim. SJ Mot. at 31–32.

To succeed on these claims, Plaintiff must prove: "(1) she is a member of a protected group, (2) unwelcome harassment occurred, (3) a causal nexus existed between the harassment and her protected status; and (4) the harassment affected a term, condition, or privilege of employment." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021) (internal quotation marks omitted). "The standard for demonstrating a hostile work environment under Title VII is demanding, and does not

prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017) (internal quotation marks omitted).

Defendants largely focus on the fourth element. This element imposes "a high threshold," *id.*, that requires Plaintiff to show that "the harassment she experienced was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment," *Hairston*, 6 F.4th at 841. This element contains both "objective and subjective components" that require her to show the harassment she endured created "an environment that a reasonable person would find hostile or abusive, and that [she] subjectively perceived the environment to be abusive." *Carter*, 997 F.3d at 811. In determining whether she meets this burden, the Court must "look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with her work performance." *Hairston*, 6 F.4th at 842 (internal quotation marks omitted). The Eighth Circuit has been clear that "[m]erely rude or unpleasant conduct are insufficient to affect the terms and conditions of employment." *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922–923 (8th Cir. 2018) (internal quotation marks omitted). Instead, Plaintiff must establish "that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (internal quotation marks omitted).

Plaintiff cannot meet that standard here. Some of the evidence presented by Plaintiff demonstrates conduct that is not acceptable in the workplace, including that women were considered "low fruit" workers and that they were not encouraged to speak at meetings. But when the Court considers the totality of the circumstances, the conduct Plaintiff cites does not rise to the

level of a hostile work environment. For much of the evidence Plaintiff cites, it is not clear that Plaintiff experienced the harassment or was present when it occurred. And more fundamentally, many of the actions and comments highlighted surely constitute "rude or unpleasant behavior," but Plaintiff has not shown how any of the conduct she cites was sufficiently severe or pervasive enough to alter the terms of her employment. *See Moses*, 894 F.3d at 923; *see also Watson*, 996 F.3d at 856. The conduct here is equivalent to—or less severe than—the conduct in cases where the Eighth Circuit has found no hostile work environment. *See Hairston*, 6 F.4th at 842; *Henson v. Union Pac. RR Co.*, 3 F.4th 1075, 1083 (8th Cir. 2021); *Carter*, 997 F.3d at 811–12; *Watson*, 996 F.3d at 856; *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 663 (8th Cir. 2021); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538–39 (8th Cir. 2020); *Moses*, 894 F.3d at 922–23; *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1175–76 (8th Cir. 2017); *Liles*, 851 F.3d at 823–24.

Since Plaintiff has not established the fourth element of her prima facie case, Defendants are entitled to summary judgment on her hostile work environment claims.

### III. Plaintiff cannot establish a retaliation claim.

Plaintiff alleges that Defendants also retaliated against her after she filed an informal EEO complaint after not receiving the Branch Chief job. Defendants argue, among other things, that Plaintiff cannot establish a prima facie case because the actions she relies upon do not constitute adverse employment actions. SJ Mot. at 33; Reply ISO SJ, ECF No. 25 at 52–54.

To prove a Title VII retaliation claim, Plaintiff must establish that (1) "[she] engaged in a statutorily protected activity, (2) [Defendants] took adverse employment action against [her], and (3) a causal connection exists between [her] protected activity and the employer's adverse employment action." *AuBuchon*, 743 F.3d at 641. Defendants primarily focus upon the second

19

element.[7]  An adverse employment action exists "if a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 642 (quoting *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)); *see Lopez*, 989 F.3d at 664–65 (same).  "Petty slights and minor annoyances[,] though upsetting, are not actionable." *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019) (quoting *White*, 548 U.S. at 68). This is so because "Title VII does not promulgate a 'civility code for the American workplace.'" *AuBuchon*, 743 F.3d at 644 (quoting *White*, 548 U.S. at 68).  To be actionable, the challenged action "must be material, not trivial."  *Lopez*, 989 F.3d at 665 (quoting *AuBuchon*, 743 F.3d at 644).  Plaintiff "avoids the triviality pitfall if she shows that the retaliation…produced some injury or harm."  *Id.*

Plaintiff has not made that showing here.  Except for failure to promote,[8] the adverse actions she relies upon are the same she cited in support of her race, disability, and sex discrimination claims.  *See supra*, § I.  The taking away of some of her projects, removing her access to certain materials and meetings, not giving her an office, monitoring her more closely, making informal complaints about her, and criticizing her for working remotely can certainly be characterized as rude, annoying, and even petty.  But Plaintiff has not shown that these actions either singly—or cumulatively—inflicted any injury or harm upon her.  *See AuBuchon*, 743 F.3d at 644–645 (collecting cases with similar actions where the Eighth Circuit found no adverse

---

[7] The Court confines its analysis to this element because the undisputed record makes clear that Plaintiff cannot satisfy it.  But as Defendants indicate, many of the acts Plaintiff's complain about do not have a causal connection to her protected activity; rather, they seem to be actions unrelated to Plaintiff's protected activity that broad swaths of employees also endured.

[8] Plaintiff does not rely on her lack of promotion as an adverse action for her retaliation claim.  That makes sense because she could not, as a matter of law.  Her getting passed over for the promotion preceded her protected activity of reporting that alleged discrimination.

20

employment action); *see also Muldrow v. City of St. Louis, Mo.*, 30 F.4th 680, 692 (8th Cir. 2022); *Lopez*, 989 F.3d at 665; *Garrison*, 939 F.3d at 943; *Higgins*, 481 F.3d at 589–91.

Since Plaintiff has not established an adverse employment action in support of her retaliation claim, Defendants are entitled to summary judgment on this claim.

**IV.     This case is referred to a Magistrate Judge for a settlement conference.**

While the Court finds that two of Plaintiff's claims survive summary judgment, there are serious questions as to whether—and to what extent—Plaintiff may have sustained damages. The undisputed record demonstrates that both the Branch Chief position as well as the position Plaintiff later got were both GS-14 positions. Plaintiff was passed over for the Branch Chief position in late 2016, but she was promoted to the other position in February 2017. So it appears that Plaintiff may have only sustained damages for, at most, a month or so. Given these potential issues with damages as well as the fact that only two claims remain, the Court finds that this case may be a good candidate for potential pretrial resolution.

Accordingly, on the Court's own motion, this case is REFERRED to a Magistrate Judge for a settlement conference. The parties are directed to have the settlement conference at the Magistrate Judge's convenience between now and December 5, 2022.

<u>**Conclusion**</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants are entitled to summary judgment on every claim except for Plaintiff's race and disability discrimination failure-to-promote claims.

**IT IS SO ORDERED.**

Date:   November 9, 2022                                   /s/ Greg Kays
                                                                         GREG KAYS, JUDGE
                                                                         UNITED STATES DISTRICT COURT